UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN P. QUINN,                    )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )     No. 4:05-CV-2294 (CEJ)
                                  )
MICHAEL J. ASTRUE[1],             )
Commissioner of Social            )
Security,                         )
                                  )
          Defendant.              )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I. Procedural History

On March 20, 2003, plaintiff John Quinn filed an application
for a period of disability and disability insurance benefits under
Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq.,
§§ 1381 et seq., and an application for supplemental security
income disability benefits under Title XVI of the Act, 42 U.S.C.
§§ 1391 et seq. (Tr. 33, 73). Plaintiff claimed disability due to
bipolar affective disorder. (Tr. 120). Plaintiff alleges that his
disability began on October 15, 2001. (Tr. 33, 73). The
applications were initially denied by defendant. (Tr. 27-31, 62-
65). Plaintiff requested a hearing, which was held before an

_____

[1]Michael J. Astrue became the Commissioner of Social
Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the
Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted for Commissioner Jo Anne B. Barnhart as the defendant
in this suit. No further action need be taken to continue this
suit by reason of the last sentence of section 205(g) of the
Social Security Act, 42 U.S.C. § 405(g).

Administrative Law Judge ("ALJ") on June 29, 2004. (Tr. 187).
Plaintiff was present and was represented by counsel at the
hearing. (Tr. 187). Plaintiff testified in response to questions
posed by his attorney and the ALJ. (Tr. 190-207). Thomas Upton,
Ph.D., a vocational expert, also testified at the hearing. (Tr.
208-215). On November 9, 2004, the ALJ found that plaintiff was
not disabled and denied his claims for benefits. (Tr. 20).
Plaintiff requested review of the ALJ's decision by the Appeals
Council. (Tr. 182-186). On November 4, 2005, the Appeals Council
denied plaintiff's request for review. (Tr. 3-6). Therefore, the
ALJ's determination denying plaintiff benefits stands as the final
decision of the Commissioner. 42 U.S.C. § 405(g).

## II. <u>Evidence Before the ALJ</u>

At the hearing, plaintiff testified in response to questions
posed by his attorney and the ALJ. At the time of the hearing,
plaintiff was forty years old. (Tr. 191). Plaintiff testified
that he graduated from high school. (Tr. 191). He was unmarried,
and lived with his grandparents. (Tr. 191). Plaintiff served in
the military for thirty days in 1983 before being discharged. (Tr.
191). He reported that he was 5'8" tall and weighed approximately
190 pounds. (Tr. 190).

Plaintiff last worked in March 2003 as an automotive
installation technician. (Tr. 192). He was terminated from that
employment after only three months. (Tr. 192). Plaintiff
unsuccessfully applied for unemployment benefits after being
terminated. (Tr. 202). Plaintiff had previously worked as an

automotive technician at two other business, for one year each. (Tr. 194). Plaintiff's other reported employment is sparse. He worked as a truck driver for a few months, as a welder for one week, and performed office work, stuffing envelopes, for three months. (Tr. 192-193). Plaintiff also testified that he worked as a landscaper for a couple of years. (Tr. 202).

Plaintiff testified that he is now unable to work because he suffers from bouts of depression and anxiety, and finds it difficult to concentrate. (Tr. 194). He has been diagnosed with bipolar disorder and was being treated by Wu Evans, M.D. (Tr. 195). Plaintiff explained that simple things, such as a temperature change in the room, are sufficient to cause him anxiety. (Tr. 195). Plaintiff does not have suicidal thoughts. (Tr. 196). Plaintiff testified that his sleep patterns vary. (Tr. 196). He occasionally lies awake for hours before falling asleep. (Tr. 196). At the time of the hearing, plaintiff was taking three different kinds of medication: Tegretol[2], Zyprexa[3], and Remeron[4]. (Tr. 195). Plaintiff testified that the side effects of these medications caused him to feel tired throughout the day. (Tr.

---

[2]Tegretol, or Carbamazepine, is a mood stabilizing drug used for the treatment of bipolar disorder and epilepsy. Common side effects include drowsiness, upset stomach, and motor-coordination impairment. http://en.wikipedia.org/wiki/Tegretol.

[3]Zyprexa is a psychotropic agent indicated in the treatment of schizophrenia and bipolar disorder. See Phys. Desk Ref. 1798-99 (60th ed. 2006).

[4]Remeron, or Mirtazapine, is prescribed for the treatment of depression. http://en.wikipedia.org/wiki/Mirtazapine.

198). Plaintiff claims that he always takes his medication. (Tr. 104).

Plaintiff testified that he is unable to participate in group activities, as he feels that he is always right and gets upset when others disagree. (Tr. 197). He admits that he has a quick temper and has problems controlling it. (Tr. 197-198). However, he has not used physical violence against anyone, despite his anger. (Tr. 198). On a questionnaire he completed in April 2003, plaintiff stated that he had trouble with these anti-social symptoms two to three times a week, if that. (Tr. 104). Plaintiff admits that he is "not the nicest" person, but still claims that he gets along with most people. (Tr. 107).

Plaintiff also complained of back pain. (Tr. 199). He testified that he occasionally visited a chiropractic clinic to help alleviate the pain. (Tr. 199). The pain is most problematic when plaintiff bends or is doing yard work. (Tr. 199). The pain is not constant, as plaintiff stated he could, at times, work an entire day without feeling it. (Tr. 200). Plaintiff believes he could lift approximately sixty pounds. (Tr. 204). He has no difficulty walking or standing. (Tr. 204). He had not taken any prescription pain medication. (Tr. 204).

Plaintiff testified that he had no problems with personal care activities, such as bathing and dressing. (Tr. 200). Plaintiff's hygiene was reported as normal. (Tr. 155). Plaintiff also performs household and lawn work without difficulty. (Tr.

201). Plaintiff testified that he is capable of running errands, such as going to the grocery store. (Tr. 201, 204).

At the hearing, plaintiff described his typical day as "not doing much of anything". (Tr. 206). He spent his days visiting with and taking care of his grandparents, talking on the telephone, watching television for a couple of hours, reading for an hour, and using the computer. (Tr. 206-207).

Thomas Upton, Ph.D., also testified at the hearing as a vocational expert. (Tr. 207-215). Dr. Upton is an assistant professor in the Rehabilitation Counselor Training Program at Southern Illinois University. (Tr. 39). Dr. Upton had not met plaintiff prior to the hearing. (Tr. 208). He had, however, reviewed plaintiff's file. (Tr. 208).

Dr. Upton testified that plaintiff's relevant work as an electronics technician was performed at the medium, semi-skilled level of employment. (Tr. 208). Plaintiff's work as a truck driver was also described by Dr. Upton as medium, semi-skilled work. (Tr. 208). Finally, plaintiff's employment as a landscaper was performed at the medium, unskilled level of employment. (Tr. 208).

The ALJ posed the following hypothetical question to Dr. Upton:

> If you would assume a worker able to lift and
> carry 50 pounds occasionally, 20 pounds
> frequently; who could sit for a total of up to
> six hours in an eight-hour work day; stand
> and/or walk for a total of up to six hours in
> an eight-hour work day, both of those assuming
> the normally allowed breaks; who would be

limited to work that involved understanding, remembering, and following simple instructions and directions; work that involved only occasional contact with the public, supervisors, or coworkers; who should not be expected to perform work that required working in teams or work groups, whether it was working in, I guess, in mutual conjunction, something like that, and in no work that involved following strict quotas, in other words, on a strict production schedule. If you were to use those factors alone, could any of the past work that you've indicated be performed?

(Tr. 209). Dr. Upton responded that he believed plaintiff's prior work as an electronics technician could still be performed, despite the limitations described in the hypothetical. (Tr. 209).

A second hypothetical was presented, asking Dr. Upton to assume the first hypothetical, but with the additional limitations that the worker would not be able to lift more than twenty pounds occasionally or tens pound frequently. (Tr. 209). Dr. Upton opined that, although plaintiff's relevant work could not be performed, the limitations described in the second hypothetical would not preclude the performance of other types of work, such as a laundry worker, stock clerk, or a production inspector. (Tr. 209-210). Additional hypothetical questions were presented to Dr. Upton by both the ALJ and plaintiff's attorney. (Tr. 210-215).

### III. **Medical Records**

On February 15, 2001, plaintiff visited the BJC Behavioral Health Center for psychiatric treatment. (Tr. 180-181). Plaintiff was seen by a Dr. Caz. He reported that his medications were helping control his bipolar symptoms. (Tr. 181). At the time,

plaintiff was taking Tegretol and Risperdal[5]. Plaintiff also reported that he was not having problems sleeping. (Tr. 181).

Plaintiff returned on March 22, 2001, and reported experiencing difficulties with self-control. (Tr. 180). He insisted on an increased dose of Tegretol. (Tr. 180). Although plaintiff was offered a two-week checkup, he declined and opted to return in six weeks. (Tr. 180).

Plaintiff next visited Dr. Caz on May 10, 2001, and again on June 7, 2001. (Tr. 179). Each time, Dr. Caz noted that plaintiff was "doing well". (Tr. 179). Plaintiff's mood was described as "stable". (Tr. 179). Plaintiff indicated that he was taking a college level computer course. (Tr. 179).

On July 27, 2001, plaintiff was examined by Eileen Wu, M.D., at BJC Behavioral Health. (Tr. 178). Dr. Wu noted that plaintiff was suffering from Bipolar Affective Disorder[6], mixed type[7], but indicated that plaintiff was "relatively stable." (Tr. 178). Plaintiff told Dr. Wu that he believed Tegretol was helping control

_____

[5]Risperdal, or Risperidone, is often used to treat delusional psychosis, but is also used to treat some forms of bipolar disorder. http://en.wikipedia.org/wiki/Risperdal.

[6]Bipolar disorder is characterized by extreme changes in mood, from mania (increased restlessness, reckless, impulsive) to depression (worthlessness, sleep problems, loss of appetite). For some people, mania or depression can last for weeks or even years, while other people experience more frequent shifts. See WebMD, http://www.webmd.com/content/article/102/106771.htm (Feb. 12, 2007).

[7]In a "mixed" bipolar state, symptoms of mania and depression occur together. For example, a person may feel very sad, while also feeling very restless and energetic. See WebMD, http://www.webmd.com/content/pages/19/103815.htm (Feb. 12, 2007).

his impulsive behavior.  (Tr. 178).  Plaintiff reported experiencing racing thought and felt an increase in energy.  (Tr. 178).

Plaintiff was next seen by Dr. Wu on September 7, 2001.  (Tr. 177).  At that visit, he reported no difficulties with eating or sleeping.  (Tr. 177).  His mood was reported as "good" and he had no complaints of impulsive behavior during this visit. (Tr. 177).  However, plaintiff still complained of having "too much energy." (Tr. 177). Plaintiff admitted that he drank large quantities of coffee, and planned to decrease his consumption.  (Tr. 177).

In November 2001, plaintiff reported irritability and anger lasting for two days.  (Tr. 176).  He reported that he felt like grabbing a random passerby out of a vehicle and injuring them. (Tr. 176).  Plaintiff explained that such feelings "come and go," but that he never acts on them.  (Tr. 176).  Plaintiff continued taking Tegretol, and he was also prescribed Zyprexa.  (Tr. 175-176).

On January 4, 2002, Dr. Wu noted that plaintiff's symptoms were improving with Zyprexa.  (Tr. 175).  Dr. Wu indicated that plaintiff was once again "relatively stable."  (Tr. 174). However, plaintiff stated that he still had moments when he was not capable of controlling his temper.  (Tr. 175).  Plaintiff reported feeling happier than he had felt in the past.  (Tr. 175). Plaintiff indicated that he was moving, and Dr. Wu transferred plaintiff's care to a clinic closer to his new home.  (Tr. 174).

On March 5, 2002, BJC Health Center intake specialist Charles E. Welsh, L.C.S.W., interviewed plaintiff.  (Tr. 162-169).

Plaintiff's psychiatrist at the new BJC clinic was N. Rao Kosuri, M.D. (Tr. 163). Mr. Welsh noted that plaintiff was then working for a friend as a courier. (Tr. 167). Plaintiff reported a history of non-compliance regarding his treatment, and stated that his discontinuation of taking his medicine had caused him to lose his job as a truck driver. (Tr. 163, 165). Additionally, plaintiff reported a history of chronic marijuana use and occasional cocaine use. (Tr. 166). Plaintiff claimed that he did not smoke or drink alcohol. (Tr. 166).

Mr. Welsh described plaintiff as "quite cooperative" and "friendly almost to the point of being effusive." (Tr. 164). Plaintiff was "appropriately groomed and dressed." (Tr. 164). Plaintiff told Mr. Welsh that he was dissatisfied with his health, family relationships, and his economic situation. (Tr. 166). He complained of racing thoughts, restless sleep, and experiencing difficulty with concentration. (Tr. 166). Mr. Welsh assigned plaintiff an initial Global Assessment of Functioning ("GAF") score of 60[8]. (Tr. 166).

On March 11, 2002, plaintiff was seen by Dr. Kosuri. (Tr. 173). Plaintiff said he felt that he was "doing well". (Tr. 173). Plaintiff stated that he was not suffering from sleep problems.

_____

[8]A GAF score of 51 to 60 represents moderate difficulty in social or occupational functioning, e.g., having few friends, having conflicts with peers or co-workers. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

(Tr. 173).  Dr. Kosuri assigned plaintiff a GAF score of 70[9] and continued his medications.  (Tr. 172).

Plaintiff returned to visit Dr. Kosuri on May 13, 2002.  (Tr. 171).  Plaintiff reported feeling tired, but had no other complaints.  (Tr. 171).  On July 15, 2002, plaintiff again presented to Dr. Kosuri.  (Tr. 171).  Plaintiff had no complaints at that visit.  (Tr. 171).  Dr. Kosuri described plaintiff as "stable," and stated that there was no thought disorder elicited.  (Tr. 160).  Plaintiff did, however, admit that he gets easily irritated. (Tr. 160).  Plaintiff also stated that he believed he may suffer from arthritis in his knees and lower back.  (Tr. 160).

On August 23, 2002, plaintiff presented to Dr. Kosuri with complaints of depression.  (Tr. 171).  Plaintiff indicated that his depression was caused by the death of his cat.  (Tr. 171).  Plaintiff's depressed state was increasing his anxiety.  (Tr. 171).  It also interfered with his sleep.  (Tr. 171).  Dr. Kosuri found no evidence of a thought disorder.  (Tr. 171).  In addition to continuing plaintiff's Tegretol prescription, Dr. Kosuri also prescribed more Remeron along with Vistaril[10] to treat plaintiff's anxiety.  (Tr. 171).

---

[9]A GAF score of 61 to 70 indicates mild symptoms (depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning fairly well and involved in meaningful relationships.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

[10]Vistaril is indicated for the symptomatic relief of anxiety associated with psychoneurosis.  See Phys. Desk Ref. 2217 (52d ed. 1998).

On November 6, 2002, plaintiff reported that he felt as if he were undergoing a mid-life crisis. (Tr. 171). However, Dr. Kosuri noted that plaintiff exhibited no signs of a thought disorder. (Tr. 170). Plaintiff's Tegretol, Zyprexa, and Remeron prescriptions were continued. (Tr. 170). On December 30, 2002, plaintiff "appeared stable" and again exhibited no signs of a thought disorder. (Tr. 170).

Plaintiff was seen on April 18, 2003, by L. Lynn Mades, Ph.D., for a consultative psychological evaluation. (Tr. 153-157). Plaintiff told Dr. Mades that he had had difficulty controlling his anger since childhood. (Tr. 153). Plaintiff denied thought-racing or feeling euphoric. (Tr. 153). Dr. Mades stated that plaintiff's prescribed medications at the time included Remeron, Zyprexa, Tegretol (Carbamazepine), and Vistaril (Hydroxyzine). (Tr. 154). Dr. Mades noted that plaintiff had "significantly more of the [Tegretol] left than would be expected from the date on the prescription." (Tr. 154).

Dr. Mades found plaintiff to be "well groomed" with normal hygiene. (Tr. 155). Plaintiff was cooperative and exhibited no deficits in motor functioning. (Tr. 155). Plaintiff was "spontaneous, coherent, relevant, and logical" throughout the forty minute interview. (Tr. 155, 153). Dr. Mades found no evidence of thought disturbance and noted that plaintiff showed an ability to maintain adequate attention and concentration throughout the exam.

(Tr. 155-156). Dr. Mades assessed plaintiff's GAF score to be 75[11]. (Tr. 157). Dr. Mades believed that plaintiff had a fair prognosis, assuming compliance with treatment and continued abstention from substance abuse. (Tr. 157).

On October 24, 2003, Dr. Kosuri opined in a letter to plaintiff's counsel that medication had improved plaintiff's condition. (Tr. 152). However, plaintiff still displayed difficulties with concentration and attention span. (Tr. 152). Dr. Kosuri also stated that plaintiff suffers from an inability to get along with others, but that he may be capable of employment in "due course of time." (Tr. 152). On that same date, Dr. Kosuri completed a Medical Source Statement assessing plaintiff's ability to do work-related activities. (Tr. 148-150). Dr. Kosuri rated plaintiff's ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisors as "good".[12] (Tr. 148). The ability to deal with work stress, function independently, and to maintain concentration were each rated "fair".[13] (Tr. 148). Other areas where Dr. Kosuri rated plaintiff as "fair" include understanding complex or detailed

---

[11]A GAF score of 71 to 80 applies when there is no more than a slight impairment in social, occupational, or school functioning. Symptoms are transient and expectable (trouble concentrating after family argument). See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000)

[12]A rating of "good" means that plaintiff's ability to function in that area is limited but still satisfactory.

[13]A rating of "fair" means that plaintiff's ability to function in that area is seriously limited, but not precluded.

instructions and relating predictably in social situations.  (Tr. 149-150).

On March 22, 2004, plaintiff returned to see Dr. Wu.  (Tr. 145).  Plaintiff described his mood as "fine".  (Tr. 145). Plaintiff was still taking Tegretol, Remeron, and Zyprexa.  (Tr. 145).  Dr. Wu noted that plaintiff exhibited manic episodes, feelings of worthlessness and racing thoughts. (Tr. 145-146).  Dr. Wu assigned plaintiff a GAF score of 55. (Tr. 146).

Dr. Wu completed a Mental Residual Functional Capacity ("RFC") questionnaire on June 17, 2004.  (Tr. 140-144).  Dr. Wu assigned plaintiff a GAF score of 50[14]. (Tr. 140).  Dr. Wu stated that plaintiff had partially responded to medication.  (Tr. 140). Plaintiff's symptoms were described by Dr. Wu to include mood disturbance, fear of heights, bipolar syndrome, sleep disturbance, manic syndrom and hyperactivity.  (Tr. 141).  Plaintiff's ability to ask simple questions and to take appropriate precautions against normal hazards were rated by Dr. Wu as "limited but satisfactory". (Tr. 142).  Dr. Wu gave the same rating to the ability to maintain socially appropriate behavior, the ability to adhere to basic standards of cleanliness, and the ability to travel in unfamiliar places and use public transportation.  (Tr. 143).  All other areas, however, were rated as either "seriously limited but not precluded" or "unable to meet competitive standards."  (Tr. 142-143).

---

[14]A GAF score of 41 to 50 indicates serious symptoms or impairments. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000)

Plaintiff was seen by Saul Silvermintz, M.D., on August 3, 2004. (Tr. 131). Plaintiff complained of pain in his back and knees. (Tr. 131). Dr. Silvermintz found that plaintiff did not "want or need any treatment" for his pain. (Tr. 132). Dr. Silvermintz completed a Medical Source Statement, examining plaintiff's physical ability to do work-related activities. (Tr. 136-138). Plaintiff was found to have no exertional limitations and a full range of motion. (Tr. 134, 136-138).

## IV.  **The ALJ's Decision**

The ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Social Security Act on October 15, 2001, the date the claimant stated he became unable to work, and continues to meet them through December 2007.

2.  The claimant has not engaged in substantial gainful activity since March 2003.

3.  The medical evidence establishes that the claimant has a bipolar disorder, cannabis and cocaine abuse in remission by claimant report, and a personality disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P Regulations No. 4. The claimant does not have a severe physical impairment.

4.  The claimant's allegations of disabling symptoms precluding all substantial gainful activity are not consistent with the evidence and are not credible for the reasons specified in the body of the decision.

5.  The claimant has the residual functional capacity to perform work except for work that involves more than simple instructions and directions or more than occasional contact with the public, supervisors, and co-workers. He should not work in teams or work groups and needs to work without strict quota production or strict deadlines. There are no exertional and no other nonexertional limitations (20 CFR 404.1545 and 416.945).

-14-

6. The claimant is able to perform his past relevant work as an electronics technician. The vocational expert credibly testified that a hypothetical individual could perform the claimant's past relevant work if he had the same vocational factors and residual functional capacity as the claimant.

7. The claimant is not under a disability, as defined in the Social Security Act and Regulations (20 CFR 404.1520(f) and 416.920(f)).

## V. <u>Discussion</u>

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u>, 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity.

If the claimant is so engaged, she is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities.  If the claimant's impairment is not severe, she is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act.  Fourth, the ALJ determines whether the claimant can perform her past relevant work.  If the claimant can, she is not disabled.  Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy.  If the claimant is not, she is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  The Court may not reverse merely because

the evidence could support a contrary outcome.  <u>Estes</u>, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.   the ALJ's credibility findings;

2.   the plaintiff's vocational factors;

3.   the medical evidence;

4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.   third-party corroboration of the plaintiff's impairments; and

6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992).

"In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000).  In these instances, the Court must "decide how the ALJ would have weighed the new evidence had it existed at the initial hearing."  <u>Id.</u>

The Court must consider any evidence that detracts from the Commissioner's decision.  <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial

evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## B.    Plaintiff's Allegations of Error

Plaintiff asserts that the ALJ's findings of residual functional capacity are not supported by substantial evidence. Specifically, plaintiff contends that the ALJ inappropriately discounted the medical opinions of plaintiff's treating physicians and gave too much weight to the opinion of a one-time consultant. Plaintiff also argues that the ALJ failed to fully and fairly develop the record by discounting the primary physician's opinion without requesting further information.

Plaintiff also argues that the ALJ failed to properly consider plaintiff's subjective complaints. Plaintiff asserts that the ALJ's conclusions regarding his lack of credibility are erroneous. Finally, plaintiff states that the hypothetical question presented to the vocational expert was misguided and did not capture plaintiff's actual impairments. Because of this error, plaintiff contends, the conclusions drawn from the vocational expert's testimony are not supported by substantial evidence.

### 1. Residual Functional Capacity

The Court will first examine plaintiff's argument that the ALJ's mental residual functional capacity assessment was erroneous. It is the duty of the ALJ to determine plaintiff's residual functional capacity, after considering all relevant evidence. See Lauer v. Apfel, 245 F.3d 700, 703-704 (8th Cir. 2001). However, "[a] claimant's residual functional capacity is a medical

question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).
Thus, while the ALJ must consider all relevant evidence, at least
"some medical evidence" must support the residual functional
capacity conclusions of the ALJ. See Lauer, 245 F.3d at 704.

Plaintiff believes that the ALJ's assessment of residual
functional capacity is erroneous due to the ALJ's reliance on the
opinions of a consultative physician over those of plaintiff's
treating physicians. "It is the ALJ's function to resolve
conflicts among the various treating and examining physicians."
Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995). "A treating
physician's opinion does not automatically control, since the
record must be evaluated as a whole." Reed v. Barnhart, 399 F.3d
917, 920 (8th Cir. 2005). However, the "treating physician's
opinion is given controlling weight if it is well-supported by
medically acceptable clinical and laboratory diagnostic techniques
and is not inconsistent with the other substantial evidence."
Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002).

In the Court's view, the ALJ properly discounted the opinions
of plaintiff's treating physicians, Dr. Kosuri and Dr. Wu. First,
Dr. Kosuri's treatment notes consistently describe plaintiff as
"stable". In March 2002, Dr. Kosuri noted that plaintiff was
"doing well". (Tr. 173). Plaintiff was assigned a GAF score of 70
by Dr. Kosuri. (Tr. 173). On visits in May 2002 and July 2002,
Dr. Kosuri indicated that plaintiff had no major complaints and
exhibited no symptoms of a thought disorder. (Tr. 160, 171).
While plaintiff did indicate to Dr. Kosuri that he felt depressed

in August 2002, he stated that it was due to the death of his cat. (Tr. 171). In November and December of 2002, Dr. Kosuri also noted that plaintiff did not exhibit signs of a thought disorder. (Tr. 170-171). Indeed, on December 30, 2002, the last day that plaintiff presented to Dr. Kosuri, plaintiff was described as "stable" with no "acute thought disorder" exhibited. (Tr. 170). Finally, Dr. Kosuri completed a medical source statement in October 2003 finding that plaintiff had a "limited but satisfactory" ability to adjust to many work related activities. (Tr. 148-150). At worst, Dr. Kosuri found that plaintiff had a "fair ability" (seriously limited but not precluded) to make some occupational, personal-social, and performance adjustments. (Tr. 148-150). Dr. Kosuri's treatment notes simply do not support the conclusion that plaintiff is disabled.

Likewise, Dr. Wu's treatment notes are inconsistent with the ultimate conclusion she drew in the Mental Residual Functional Capacity questionnaire dated June 2004. (Tr. 140-144). In that questionnaire, Dr. Wu assigned plaintiff a GAF of 50 and rated many of the aptitudes on the questionnaire as "seriously limited" or "unable to meet competitive standards". (Tr. 140-144). However, Dr. Wu's earlier treatment notes, like those of Dr. Kosuri's, indicate that plaintiff was relatively stable throughout his visits. (Tr. 178). In July 2001 plaintiff told Dr. Wu that his medications were helping control his symptoms. (Tr. 178). In September 2001, Dr. Wu described plaintiff's mood as "good", and noted that plaintiff was not experiencing impulsive behavior. (Tr.

177).  In January 2002, Dr. Wu found that plaintiff was relatively stable and his symptoms were improving, despite his difficulty in controlling his temper.  (Tr. 175).  In Dr. Wu's only other examination of plaintiff, in March 2004, plaintiff's mood was described as fine.  (Tr. 145).  Dr. Wu also noted that plaintiff was not suffering from anxiety or sleep problems.  (Tr. 145).  However, three months later, despite not examining plaintiff any further, Dr. Wu stated that plaintiff suffered from persistent anxiety and sleep disturbance.  (Tr. 141).  These inconsistencies detract from Dr. Wu's ultimate conclusions contained in her RFC questionnaire.

Further, these conclusions are inconsistent with the opinion of plaintiff's consultative doctor, Dr. Mades.  Dr. Mades assigned plaintiff a GAF score of 75, indicating that plaintiff suffered only mild symptoms and was doing well.  This conclusion is more fully supported by the medical evidence as a whole.  Therefore, it was not erroneous for the ALJ to give greater weight to the opinion of Dr. Mades than that given to either Dr. Wu or Dr. Kosuri.  See Anderson v. Barnhart, 344 F.3d 809 (8th Cir. 2003).

Plaintiff argues that the ALJ was required to recontact Dr. Kosuri and Dr. Wu for additional information prior to discounting their opinions.  An ALJ is "not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped."  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).  The ALJ does not indicate that any issue was left untouched by the treating physicians' notes.  Instead, the ALJ

found that their conclusions and RFC assessments were not supported by substantial evidence. The ALJ was not required to recontact plaintiff's treating physicians.

Plaintiff also asserts that the ALJ failed to outline with specificity the factors which led him to give more weight to the opinion of Dr. Mades. However, the ALJ discusses in detail the inconsistencies between the medical evidence and the conclusions of plaintiff's treating physicians. (Tr. 15-16). The ALJ identifies specific treatment notes which detract from the treating physicians' opinions and does not rely on general conclusions.

The Court finds that the ALJ properly assessed plaintiff's residual functional capacity. In making that assessment, there was no error in relying on the consultative physician's opinion over those of the treating physicians.

### 2. Credibility Determination

The Court will now discuss plaintiff's assertion that the ALJ failed to properly consider plaintiff's subjective complaints. The ALJ found that plaintiff was not fully credible and cited the familiar Polaski factors. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Under Polaski, when assessing whether a claimant's subjective complaints are credible, the ALJ must consider all of the evidence, including claimant's work history and observations regarding: (1) claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) the dosage, effectiveness and side effects of medication; (4) any precipitating and aggravating factors; and (5) claimant's functional

-22-

restrictions." Polaski, 739 F.2d at 1321. However, the ALJ is not required to discuss each Polaski consideration, so long as its considerations were acknowledged and examined prior to discounting the claimant's subjective complaints. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

The Court finds that, in his assessment of plaintiff's credibility and alleged disability, the ALJ considered the correct factors as set forth in Polaski. The ALJ noted Dr. Kosuri's findings that plaintiff had a good ability to understand, remember, and carry out simple instructions, along with a fair ability to interact with supervisors. (Tr. 14). The ALJ also noted that plaintiff's ability to relate to co-workers was evaluated as "good". (Tr. 14). Such observations from plaintiff's treating physician are "inconsistent with an inability to perform a wide range of work due to a mental health condition." (Tr. 14). The ALJ also noted that the assessment of Dr. Mades indicated that plaintiff had only a slight impairment in his interactions with others, which was inconsistent with plaintiff's allegations of mental disability. (Tr. 14).

The ALJ also found that plaintiff's "noncompliance, lack of regular treatment, and work activity after the alleged onset are factors that detract from the credibility of his allegations of disabling symptoms." (Tr. 15-16). The ALJ noted that, although plaintiff was scheduled to have bimonthly appointments, he had presented for a psychiatric examination only on one occasion since December 2002. (Tr. 16). Additionally, a rehabilitation plan

signed by Dr. Kosuri and Mr. Welsh noted that plaintiff had a "history of non-compliance and discontinuing treatment." (Tr. 163). Plaintiff also has a history of relapse of polysubstance abuse. Plaintiff admitted that he did not attend rehabilitation programs because he believed them to be useless. (Tr. 17). The ALJ found no good cause for plaintiff's lack of interest in treatment. There is no indication that plaintiff refused or discontinued treatment because of any inability to pay or any other reason. As the ALJ noted, plaintiff's "noncompliance suggests that [his] symptoms have not been serious enough, in his perception, to warrant compliance with his medical treatment directives." (Tr. 18).

There is evidence that, had plaintiff continued his treatment, his symptoms would have improved. The ALJ correctly found that the medical records indicated that plaintiff's symptoms responded well to medication. (Tr. 17). If symptoms can be controlled by medication, they are not considered disabling. See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004).

The ALJ also found that plaintiff's daily activities detracted from his credibility. (Tr. 16). The ALJ noted that plaintiff had no problems driving his automobile, visiting relatives, performing yard work, and doing occasional errands. (Tr. 16). Plaintiff also played disk golf in a foursome once or twice per month in the year prior to the hearing. (Tr. 16). These interactions and activities, as the ALJ noted, detract from plaintiff's claims of a disabling inability to interact with others.

The ALJ suggested that plaintiff's application for unemployment compensation benefits in 2003 indicated that plaintiff believed hmself capable of work. (Tr. 18). The Eighth Circuit has noted that an "application for unemployment compensation benefits adversely affects [the claimant's] credibility." Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991). It was not erroneous for the ALJ to find that plaintiff's 2003 application for unemployment benefits detracted from his allegations of an inability to work due to any disabling impairment.

The Court concludes that the ALJ properly considered and applied the Polaski factors in assessing plaintiff's credibility. The substantial evidence throughout the record is inconsistent with plaintiff's subjective claims of a disabling mental impairment.

### 3. Vocational Expert Testimony

Plaintiff's final argument is that the hypothetical question posed to the vocational expert was flawed and did not capture the concrete consequences of plaintiff's impairments. Specifically, plaintiff argues that the hypothetical question did not encompass all of the symptoms and difficulties described by plaintiff's treating physicians. Plaintiff argues that the expert's answer to the hypothetical question cannot be considered substantial evidence because it was based on an erroneous RFC determination.

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)(internal citations

omitted).  The Court finds no error in the hypothetical question given by the ALJ to the vocational expert.  As noted above, it was appropriate for the ALJ to discount the opinions of plaintiff's treating physicians.  Therefore, the symptoms and limitations described by those physicians were not required to be included in the hypothetical question.  See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

Substantial evidence, including the vocational expert's answer to the hypothetical question, supports the finding that plaintiff can perform his past relevant work as an electronics technician. (Tr. 208-209).  Therefore, plaintiff is not disabled within the meaning of the Social Security Act and Regulations.  See 20 CFR 404.1520(f) and 416.920(f).

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his complaint and his brief in support of complaint is **denied**.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 20th day of February, 2007.